# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN A. ROGOWSKYJ, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1930 (ESH) |
| | ) | |
| GENERAL JAMES T. CONWAY,[1] | ) | |
| Commandant of the Marine Corps, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

Petitioner John A. Rogowskyj, Jr., is a serviceman who was denied discharge from the Marine Corps as a conscientious objector. He now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the reasons explained herein, Rogowskyj's petition will be denied.

## BACKGROUND

In 2002, Rogowskyj voluntarily enlisted in the Marine Corps Reserve for a term of eight years. (*See* AR 39–40.) At the time, he stated that he was not, and never had been, a conscientious objector. (*See id.* at 38.) In February 2006, however, he applied for discharge from the Marine Corps contending that, since the time of his enlistment, he had developed a religious opposition to war in all forms. (*See id.* at 23–30.)

According to Rogowskyj's application, his opposition to war crystallized in the fall of 2005 when, while reading a book related to vegetarianism, he encountered the notion that

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), General James T. Conway is substituted for his predecessor, General Michael W. Hagee, as commandant of the Marine Corps.

"compassion toward animals is an obligation of humans," which led him to realize that humans owe an equivalent duty to other humans. (*Id.* at 25.) This realization in turn led him to believe that "it does not matter how much violence threatens us we should not respond in kind," and that "violence as a means or end cannot be tolerated." (*Id.*) In his application, Rogowskyj further stated: "I see no place for myself in further assisting any operation, the goal or means of which include[s] killing or harming another human being." (*Id.* at 24.)

Rogowskyj's application underwent the military's standard review process, beginning with interviews by a chaplain and two psychiatrists. Without making specific recommendations as to whether Rogowskyj should be discharged, these interviewers found that he was sincere in his asserted beliefs. (*See id.* at 31, 32.) In addition, the psychiatrists found that he exhibited "[a]voidant personality traits," and the chaplain found that he was "very confused theologically." (*Id.*)

After his preliminary interviews with the chaplain and psychiatrists, Rogowskyj had a three-hour hearing before an appointed investigative officer, Captain Christian T. Devine. (*See id.* at 17, 18.) Based on Rogowskyj's testimony at the hearing and Rogowskyj's application package as a whole, Devine concluded that Rogowskyj is a conscientious objector. (*Id.* at 21.) Specifically, Devine found that "[Rogowskyj's] testimony overall seemed sincere, thorough, and well-formulated." (*Id.* at 20.) He recommended that Rogowskyj's request for discharge be approved. (*Id.* at 21.)

Devine's recommendation, together with the rest of Rogowskyj's application package, was then forwarded to Rogowskyj's company commander, Major M.A. Stolzenburg. Stolzenburg "concur[red] with the investigation finding that Lance Corporal Rogowskyj is a

2

conscientious objector by reason of the development of his spiritual beliefs." (*Id.* at 16.)
However, Stolzenburg disagreed that Rogowskyj should be discharged, stating: "It is my intent
that [Rogowskyj] serve the company in the capacity of Supply Clerk, a non-combatant billet.  He
has acknowledged to me that he would be able to perform this duty without contravening his
belief system." (*Id.*)  Accordingly, Stolzenburg recommended disapproval of Rogowskyj's
application.  (*Id.*)

Rogowskyj's application package was next reviewed by his battalion commander,
Lieutenant Colonel W.S. Nagle.  Nagle found that "Rogo[w]skyj's general demeanor and pattern
of conduct [was] consistent with his asserted beliefs," and that Rogowskyj's "beliefs seem[ed]
thorough." (*Id.* at 14.)  "In the net," however, Nagle considered Rogowskyj's case
"unconvincing." (*Id.* at 13.)  For one, Nagle found that, aside from Rogowskyj's application
itself, the "most tangible evidence of the outcomes of his belief [were] that he now volunteers at
a homeless shelter, has become a vegetarian, and intends to lobby for an expansion of
conscientious objector rights." (*Id.*)  Although such acts were "significant and
charitable . . . , they [did] not clearly demonstrate that [Rogowskyj's] belief is the primary
controlling force in his life," as required by MCO 1306.16E ¶ 5.c(1).  (*Id.*)  Additionally, Nagle
found that Rogowskyj's statements regarding "non-traditional religious / moral / philosophical
discovery" were "not convincing that his activity was comparable in rigor and dedication to the
processes by which traditional religious convictions are formulated," as required by MCO
1306.16E ¶ 5.c(2)(b).  (*Id.* at 13–14.)  Accordingly, while recognizing that Rogowskyj's
application was "consistent and sincere," Nagle recommended disapproval.  (*Id.* at 14.)  The last
of Rogowskyj's commanders to review his application package, Major General D.V. Odell, Jr.,

3

agreed with Nagle's recommendation. (*See id.* at 12.)

After reviewing the findings and recommendations of his reviewers, Rogowskyj submitted a rebuttal and an additional letter of support. (*See id.* at 5–11.) In response to Stolzenburg's statement that Rogowskyj had acknowledged that he could perform the noncombatant duties of a supply clerk, Rogowskyj explained: "In point of fact, it did not occur to me at the time that supply is responsible for providing ammunition, which directly contributes to violence. I cannot be blind to the fact that they will use this ammunition, not just to support their missions as a whole, which my presence in the Marine Corps does, but also to intimidate, escalate and kill others in confrontations." (*Id.* at 5.) Regarding Nagle's finding that Rogowskyj lacked tangible evidence of his faith, Rogowskyj stated: "In my daily life, the revelation I have had about violence has had little discernible impact, because violence is not a part of my everyday life, except insofar as I am supporting troops preparing for combat, in this moment." (*Id.* at 6.)

Rogowskyj's rebuttal and the rest of his application package were then forwarded to Marine Corps headquarters, where the Conscientious Objector Status Screening Board ("Board") convened to review Rogowskyj's case. (*E.g.*, *id.* at 1.)

> The board voted unanimously that Lance Corporal Rogowskyj failed to provide convincing evidence that his claims of objection to war in any form were sincere and deeply held and that they were the primary controlling force in his life. Further, the timing of his request, coming after notification of his unit's combat mobilization, caused the board to believe that he was seeking conscientious objector status solely to avoid a combat deployment to Iraq.

(*Id.* at 2.) On October 6, 2006, the Board (on behalf of the commandant) formally disapproved Rogowskyj's application. (*See id.* at 4.)

4

**ANALYSIS**

## I.    Standard of Review

The Court may not disturb the denial of Rogowskyj's application "unless there is no factual basis for the decision." *Aguayo v. Harvey*, --- F.3d ---, ---, 2007 WL 489220, at *5 (D.C. Cir. 2007) (citing *United States v. Seeger*, 380 U.S. 163, 185 (1965)). "The scope of . . . review under the 'basis in fact' standard is extremely narrow." *Id.* The Court may not second-guess the military's judgment or require substantial evidence for its decision. *See id.* (citing *Witmer v. United States*, 348 U.S. 375, 380–81 (1955)). This "limited scope of review" is both "dictated by precedent" and "consistent with the general principle that courts will afford military personnel decisions considerable deference." *Id.* at ---, 2007 WL 489220, at *6 (citing *Piersall v. Winter*, 435 F.3d 319, 321–22 (D.C. Cir. 2006)).

## II.    Legal Framework

The Department of Defense has, by regulation, "extended the congressionally approved conscientious objector exemption for pre-induction personnel to in-service members of the Armed Forces by providing for administrative discharge on the grounds of conscientious objection." *Jashinski v. Holcomb*, No. 05-1073, 2006 WL 1149156, at *3 (WD. Tex. Mar. 3, 2006); *accord Aguayo*, --- F.3d at ---, 2007 WL 489220, at *6. The Department of Defense regulations, which are currently published under 32 C.F.R. §§ 75.1–75.11, serve as the basis for Marine Corps Order ("MCO") 1306.16E, which governs applications for conscientious objector status within the Marine Corps.

The Marine Corps defines "conscientious objection" as "[a] firm, fixed, and sincere objection to participation in war in any form or the bearing of arms, by reason of religious, moral

5

or ethical training, and belief." MCO 1306.16E enclosure (1) ¶ 1. "Religious training and belief" is defined to include "[b]elief in an external power or being or deeply held moral or ethical belief, to which all else is subordinate or upon which all else is ultimately dependent." *Id.* ¶ 3. Thus, although a qualifying belief may be unorthodox, "[it] must be the primary controlling force in the applicant's life and must be of the same strength and depth as found in traditional religious convictions." MCO 1306.16E ¶ 5.c(1).

Consistent with the above definitions, "an application for classification as a conscientious objector may be approved for any individual: (1) [w]ho is conscientiously opposed to participation in war in any form; (2) [w]here opposition is founded on religious training and belief; and (3) [w]hose position is sincere and deeply held." *Id.* ¶ 5.b. An applicant bears the initial burden of demonstrating, by clear and convincing evidence, that his application meets the required criteria. *See* 32 C.F.R. § 75.5(d); MCO 1306.16E ¶ 4.b. "Once this responsibility is met, the conscientious objector status will be granted unless the Government can establish a rational basis in fact for denying the application." *Id.*

## III.    Assessment of the Board's Decision

When, as here, an applicant does not claim adherence to a traditional religion, the Board may consider "whether [the applicant's] ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated," such that his convictions represent the "primary controlling force in [his] life." *Id.* ¶¶ 5.c(1), 5.c(2)(b).

The D.C. Circuit recently applied these principles in *Aguayo*. Aguayo was agnostic but expressed "a deep admiration for people such as Jesus Christ, Gandhi, and Martin Luther King,"

6

and a desire to follow their pacifist values. --- F.3d at --- , 2007 WL 489220, at *3 (quoting

Aguayo's application). In seeking discharge as a conscientious objector, Aguayo explained that,

although he had not been a conscientious objector at the time of his enlistment, his beliefs had

changed through his experiences in Army training - - notably his experience learning to fire an

M-16. *Id.* at ---, 2007 WL 489220, at *2. In upholding the denial of Aguayo's application, the

D.C. Circuit held:

> Though Aguayo stated that his Army training caused him anguish and guilt, we find
> little indication that his beliefs were accompanied by study or contemplation, whether
> before or after he joined the Army. More to the point, we certainly cannot say that
> the reviewing officers' doubts as to Aguayo's convictions are so inconsistent with the
> record that their recommendations must be disregarded. In this appeal, Aguayo
> insists that the 'crystallization' of conscientious objector beliefs, like the process of
> religious conversion, is not always the result of prolonged study and can instead be
> dramatic and quick, as when it is precipitated by a life crisis - - in Aguayo's case, his
> experience in weapons training. Clearly, this was not an open-and-shut case: both
> Aguayo's Company Commander and the investigating officer recommended the
> application be approved. But the decision in close cases rests with the [Board], not
> the courts, and the officers' recommendations are consistent with both the Army's
> regulations and the record.

*Id.* at ---, 2007 WL 489220, at *9.

Here, by contrast to *Aguayo*, the record does contain some evidence that the

crystallization of Rogowskyj's conscientious objector beliefs was the result of study and

contemplation. Rogowskyj describes "years of self-inquiry and self-discovery," both before and

after he became a Marine. (AR 6.) Specifically, Rogowskyj's application attributes the "shift in

[his] views" to reading and "pondering" the statement that "human compassion toward animals is

an obligation of humans." (*Id.* at 25.)

However, like Aguayo, Rogowskyj describes the shift in his views about war as an

"epiphany" that he experienced when, "in an instant," he recognized "the sudden link between

taking a human life and terminating one of God's creations." (*Id.* at 5.) He further explains: "While it is true that I had not yet experienced the epiphany that life of man is surely as sacred as a cow at the time of enlisting, the beliefs that I held were otherwise largely the same as today, having developed over a period of years." (*Id.* at 8.)

Such statements are particularly probative in light of Nagle's determination that Rogowskyj's account of his "non-traditional religious / moral / philosophical discovery" was "not convincing that his activity was comparable in rigor and dedication to the processes by which traditional religious convictions are formulated." (*Id.* at 13–14.) Given Rogowskyj's description of "rather nuanced self-study," Nagle doubted that Rogwoskyj could have made a "180 degree change regarding the role of the military." (*Id.* at 14.) Bolstering Nagle's skepticism were Rogowskyj's statements that he wished to disengage from the "harsh realities of the rest of the world" (Nagle's words) and comments by Devine, the psychiatrists, and the chaplain suggesting that Rogwoskyj exhibits avoidant and self-indulgent tendencies. (*Id.*; *see, e.g.*, *id.* at 20–21 (describing Rogowskyj's process of philosophical discovery as "spiritual self-indulgence" and classifying him as "merely a spectator, sitting in the bleachers of life").) Nagle also doubted whether Rogowskyj's asserted opposition to war was "the primary controlling force in his life" given that the "most tangible evidence of the outcomes of his belief is that he now volunteers at a homeless shelter, has become a vegetarian, and intends to lobby for an expansion of conscientious objector rights." (*Id.* at 13.)

Rogowskyj asks the Court to dismiss Nagle's conclusions as "unconvincing." (Traverse at 11, 12.) He argues that "[Nagle's] conclusions ignore the extensive record of facts [that he has] presented . . . [to] illustrate the formulation and foundation of his beliefs;" that "Nagle's

conclusion[s] [are] diametrically opposite to that of [Devine], [the] chaplain, and [the two psychiatrists], who extensively examined [him] in person and were in the best position to make a credibility assessment;" and that the record contains "significant objective evidence of [his] deeply held beliefs." (*Id.* at 12–13.)

The Court recognizes that this is "not an open-and-shut case." *Aguayo*, --- F.3d at ---, 2007 WL 489220, at *9. Indeed, the case may be even closer than *Aguayo*, because six of the seven military officials who interviewed Rogowskyj or reviewed his application in preparation for the Board's review appear not to have doubted his sincerity.[2] (*See id.* at 14, 16, 20–21, 31, 32 (implicit finding of sincerity by Stolzenburg, and express findings by Nagle, Devine, the chaplain, and the two psychiatrists); *see also id.* at 11, 34, 35 (statements from Rogowskyj's colleague, friend, and father vouching for Rogowskyj's sincerity); Pet.'s Ex. 3 (statement from Rogowskyj's wife attesting to his sincerity).) However, "the decision in close cases rests with the [Board], not the courts." *Aguayo*, --- F.3d at ---, 2007 WL 489220, at *9. The record in

---

[2]In addition, whereas in *Aguayo* there was reason to doubt the applicant's sincerity because he had applied for discharge "just days before his deployment to Iraq," the timing of Rogowskyj's application is less clear-cut. *Aguayo*, --- F.3d at ---, 2007 WL 489220, at *9. As the commandant now appears to concede, the Board erred in determining that Rogowskyj did not apply for conscientious objector status until after receiving formal notification of his unit's mobilization. (*See* Resp. at 5 (explaining that Rogowskyj submitted his application "one month *prior* to receiving formal notification that his unit was to be deployed to Iraq" (emphasis added)).) However, the record supports the conclusion that, even before receiving formal notification of his deployment, Rogowskyj may have had some informal "warning." (*See* AR 14 ("The timing of his development of beliefs and submission of application is suspiciously parallel with the unit's mobilization *warning* and notification." (emphasis added)); *see also id.* at 31 (stating, two days before the Marine Corps issued Rogowskyj's formal notification of deployment, that Rogowskyj's beliefs "perhaps" developed "through the realization that he may be going to war very soon").) In any event, the Board did not rest its decision to deny Rogowskyj's application on suspicious timing. (*See id.* at 2, 4 (citing timing as a supplemental rationale for disapproving Rogowskyj's application).)

Rogowskyj's case, while far from compelling (especially given the Board's inaccurate statement regarding the timing of Rogowskyj's mobilization notification (*see supra* note 2)), supplies a basis in fact for the Board's denial of his application.

Thus, under the extremely narrow standard of review applicable in military habeas cases, the Court is constrained to deny Rogowskyj's petition.

_____ s/ _____
ELLEN SEGAL HUVELLE
United States District Judge

Date: March 13, 2007